IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| BASIL ALLEN, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )    CIVIL ACTION 06-0199-WS-B |
| | ) |
| KIMBERLY-CLARK CORPORATION | ) |
| PENSION PLAN, | ) |
| | ) |
|     Defendant. | ) |

ORDER

This matter is before the Court on defendant Kimberly-Clark Corporation Pension Plan's Motion for Summary Judgment (doc. 30).[1]  The parties have been afforded a full opportunity to brief the Motion, and the administrative record that underlies this litigation has been placed in the court file.  Accordingly, the Motion is now ripe for disposition.

I.      **Background.**[2]

A.      *Plaintiff's Migraine Headaches.*

The relevant facts in this ERISA action are not in dispute.  Plaintiff Basil Allen was a long-time employee of Kimberly-Clark Corporation, as an Outside Driver, among other capacities.  (Administrative Record, at 37.)  On June 21, 1996, Allen consulted with a neurologist, Fritz A. LaCour, Jr., M.D., complaining of severe headaches that he had been suffering for the last two or three years, causing him to miss approximately 20 days of work annually.  (*Id.* at 49-50.)  Dr. LaCour diagnosed Allen as having migraine headaches and

---

[1]      Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically.  However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

[2]      The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1217 (11th Cir. 2005).  Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in his favor.

prescribed a treatment regimen of medication, exercise, and avoidance of caffeine.  (*Id.* at 50.)
Allen saw Dr. LaCour for treatment of his migraines on an ongoing basis through at least
January 1998, with clinical records reflecting that Allen continued to complain of headaches but
that, as of January 1998, he reported that he was "doing better generally" and that he was
satisfied with the control of his headaches.  (*Id.* at 44-48.)  All indications are that Allen
continued to work at Kimberly-Clark without incident during this time period.

On October 9, 1999, Allen reported that he was unable to continue working at Kimberly-
Clark because of an increase in the severity and frequency of his headaches.  (*Id.* at 38.)[3]  Allen
began a medical leave of absence from work at that time, and received weekly disability income
benefits from October 10, 1999 through November 7, 1999.  (*Id.* at 37-38.)  Allen's family
practice physician and neurologist both released him to return to work at his own occupation
effective November 8, 1999 and his weekly disability benefits were terminated at that time;
however, he never came back to work at Kimberly-Clark.  (*Id.*)

B.      *Plaintiff's Application for T&PD Benefits.*

On or about November 29, 1999, Allen applied for Total and Permanent Disability
Benefits ("T&PD Benefits") through defendant, the Kimberly-Clark Corporation Pension Plan
(the "Plan").  Allen's application was accompanied by a statement from his family practice
physician, George S. Sutton, M.D., indicating that Allen became disabled on October 9, 1999
because of "migraines induced by mental and physical stress.  Not helped by meds he can take
and work.  Could probably do OK in quiet low pressure sedentary job."  (*Id.* at 53.)  Dr. Sutton

---

[3]      This fact and certain others relating to events occurring in the months following
his complaint that he was unable to continue working are drawn from the February 1, 2002 Total
and Permanent Disability Appeal recommendations made by Aetna U.S. Healthcare ("Aetna"),
the administrator of Kimberly-Clark's long term disability plan.  Somewhat surprisingly, the
administrative record lacks underlying documentation of this October 1999 complaint by Allen
as well as certain ensuing events recited in Aetna's appeal recommendation, such as the release
to work by Allen's physicians.  Nonetheless, any concerns arising from the absence of
underlying records documenting these events in the administrative record are vitiated by Allen's
admission that "the basic facts as set forth by the Defendant are essentially accurate" (Plaintiff's
Brief (doc. 35), at 1.), and his failure to controvert them.  The Court therefore accepts as true the
summary recitation of facts in the Aetna appeal recommendations (as set forth in defendant's
summary judgment filings).

classified Allen as being "able to engage in only limited stress situations and engage in only limited interpersonal relations (moderate limitations)." (*Id.*) Dr. Sutton's assessment also reflected that Allen's restrictions (standing/walking for no more than 1-4 hours per workday, sitting for no more than 1-3 hours per workday, and driving for no more than 1-3 hours per workday) were permanent, that he was not a candidate for rehabilitation, and that he was "[g]enerally incapacitated, with pain, photophobia, nausea when afflicted" by migraines. (*Id.* at 53, 64.)

Allen's application for T&PD Benefits was submitted pursuant to the Plan, which predicates eligibility for benefits on the employee having at least 15 years of service (which Allen did), and having "presented proof satisfactory to the Retirement Board of his existing Total and Permanent Disability." (Record, at 197, § 3.3.) "Total and Permanent Disability" is a defined term in the Plan, meaning "a disability that totally disables the [employee], either physically or mentally, to such an extent that he is rendered wholly or continuously unable to engage in any occupation or perform any work for any kind of compensation of financial value. The disability must be certified by a licensed Doctor of Medicine to be such as can reasonably be expected to continue during the remainder of the [employee]'s lifetime." (*Id.* at 193.) Under the terms of the Plan, the Kimberly-Clark Retirement Board "shall have the exclusive discretionary authority to determine eligibility for and the amount of benefits under the Plan, to make factual determinations, to construe the terms of the Plan, to resolve any ambiguity therein, and to determine any question which may arise in connection with its operation or administration. Its decisions or actions in respect thereof shall be conclusive and binding upon the Company and upon any and all Employees ...." (*Id.* at 221 § 7.7.)

Allen's application was reviewed and denied by the Retirement Board, by and through the Kimberly-Clark Pension Plan Committee (the "Committee"), on several occasions.[4] First, on February 29, 2000, the Committee announced its decision that the medical documentation submitted by Allen was insufficient to indicate that he was Totally and Permanently Disabled, as

---

[4]       Neither party questions or in any way challenges the Committee's authority to act, even though the Plan language is worded in terms of the "Retirement Board." It is therefore apparent that the Committee is the agent, designee, or alter ego of, or is otherwise synonymous with, the Retirement Board referenced in the Plan documents.

defined in the Plan, as of his assumed retirement date of December 31, 1999.  (*Id.* at 35.)  In justifying this decision, the Committee observed that (i) Dr. Sutton had opined that Allen could probably work a quiet, sedentary job, (ii) Allen had continued working, despite his migraine headache diagnosis, for a number of years, and (iii) Allen had been released by his physicians to return to work on November 8, 1999, but did not do so.  (*Id.* at 35-36.)  Based on these record facts, the Committee found that Allen was "not totally disabled from work of any kind, as required under the definition of Total and Permanent Disability."  (*Id.* at 36.)  The Committee expressly invited Allen to request review of this decision, but cautioned him that he would need to provide additional medical information sufficient to establish that his condition was permanent and prevented him from engaging in work of any kind as of his assumed termination date.  (*Id.* at 36.)

Allen appealed from the adverse Committee decision; however, he failed to submit "any new objective clinical findings to support his inability to engage in any occupation or perform any work for any compensation of financial value."  (*Id.* at 39.)  After reviewing the record, on February 1, 2002 Aetna recommended that the denial of Allen's request for T&PD Benefits be upheld, on the grounds that his neurologist had released him to return to work at his own occupation on November 8, 1999; that his family practitioner reported that Allen was only moderately limited and that he was capable of sedentary work activity; that Allen continued working at Kimberly-Clark for more than five years with a migraine headache diagnosis; and that Allen had failed to show that he was totally and permanently disabled within the meaning of the Plan.  (*Id.* at 38-39.)  The Committee adopted these recommendations in March 2002,[5] concluding that it "was unable to determine that [Allen's] condition is permanent, totally disabling, *and* prevents [him] from engaging in *any* occupation or perform[ing] any work for any kind of compensation or financial value.  Therefore, the Committee has again denied [Allen's] claim for a Disability Benefit under the Plan."  (*Id.* at 34.)[6]

---

[5]     Although the written decision is dated March 26, 2002, it was apparently made at a Committee meeting held on March 5, 2002.  (*Id.* at 33.)

[6]     The Committee's March 26, 2002 determination specifically noted that Allen had failed to provide any new medical information for review, that he had provided no medical

C.      *The Social Security Proceedings.*

Concurrently with his efforts to procure T&PD Benefits under the Plan, Allen made a separate claim for disability benefits before the Social Security Administration.  Kimberly-Clark and the Plan were not party to or in any way involved in these Social Security proceedings.  On August 16, 2001, an Administrative Law Judge (the "ALJ") issued a decision finding that Allen "has been under a disability as defined by the Social Security Act and Regulations since October 9, 1999."  (Record, at 13.)  In so concluding, the ALJ recited the following opinions of John L. Hinton, M.D.: (i) Allen suffers from five to six migraine headaches per week, with pain rated at 9 or 10 on a 10-point scale (with 10 being the worst imaginable pain); (ii) he experiences adverse side effects with any prescription medication he takes; (iii) his headaches are accompanied by nausea, vomiting, photophobia and sonophobia; and (iv) Allen's diagnosis is chronic daily headaches.  (*Id.* at 12.)  The ALJ also referenced Dr. Sutton's statements that prescription medication provided only "poor control of the migraine headaches," that Allen's pain was so great "as to be distracting to adequate performance of work activities," and that medication side effects are expected to be severe in causing distraction, inattention and drowsiness.  (*Id.*)  Based on all of this evidence and Allen's demeanor during the hearing, the ALJ was persuaded that Allen's "pain is indeed of such severity and intractability as to preclude all forms of work activity" and that "[t]he severity of the claimant's impairment has reduced his residual functional capacity to a point where no work exists, which he can perform on a regular or sustained basis at acceptable levels of performance."  (*Id.* at 12-13.)

After the ALJ's decision was rendered, Allen's then-counsel forwarded a copy of it to Kimberly-Clark via letter dated March 19, 2002.  (*Id.* at 6.)  Kimberly-Clark acknowledged receipt of the ALJ decision and indicated that even though Allen had already exhausted the Plan's claims and appeals procedures, the Committee could elect to review this supplemental

_____

reports from Dr. Sutton, and that he had provided no recent reports from Dr. LaCour, notwithstanding the Committee's suggestions in its previous determination letter that he would need to come forward with such new evidence in order to prevail on appeal.

information in its discretion. (*Id.* at 5.)[7]  Kimberly-Clark advised Allen's counsel in writing that it was forwarding the ALJ opinion to the Committee, and invited Allen's counsel to submit any additional information he wished for the Committee to consider (listing specifically the medical information referenced in the ALJ decision) prior to the Committee's next scheduled meeting in April 2002. (*Id.*)  To the extent that counsel required additional time to collect and forward such information, Kimberly-Clark asked that Allen's counsel inform it of that fact so that appropriate accommodations could be made. (*Id.*)  It appears, however, that Allen's counsel neither forwarded additional medical documentation nor requested additional time to do so; rather, the only new information that accompanied Allen's file back to the Committee was the ALJ decision itself.[8]

In its discretion, the Committee examined Allen's application for benefits a third time at a meeting on April 26, 2002.  At that time, the Committee reviewed all documentation submitted in connection with his original claim and appeal, and also considered the ALJ's decision that Allen was entitled to Social Security Disability benefits.  The Committee found that the ALJ decision did not alter its conclusion that Allen was not entitled to T&PD Benefits under the Plan. In so concluding, the Committee reasoned as follows: (a) Allen had never submitted the clinical information relied on by the ALJ to the Committee for review; (b) the medical reports from Dr. Hinton on which the ALJ relied were never submitted to the Committee for review; and (c) the definition of disability for Social Security purposes was materially different from that under the Plan. (*Id.* at 2.)  On this last point, the Committee stressed that Social Security classifies one as

---

[7]  Allen does not maintain in this litigation that he had not in fact exhausted the Plan's claim and appeals procedures, nor does he quarrel with Kimberly-Clark's position that consideration of any information submitted following the March 5, 2002 denial of Allen's appeal was entirely discretionary with the Committee.

[8]  At most, Allen's new lawyer faxed a letter to the Committee on April 26, 2002, requesting to supplement the record with Allen's medical documentation that was missing from the record at that time. (*Id.* at 3-4.)  Although the letter is dated April 22, 2002, the fax cover sheet is dated April 26, 2002, and it appears that the letter was not transmitted until that time. The date is significant because the Committee met on April 26, 2002 and again reviewed Allen's application for T&PD Benefits at that time.  Allen's counsel's letter offering to submit further supplemental materials was received too late. (*Id.* at 1.)

disabled if a physical or mental impairment rendering him unable to perform any substantial gainful activity is expected to last for a continuous period of at least 12 months; by contrast, the Plan requires that the disabling condition be expected to last for the remainder of the person's lifetime.  There being no clinical evidence that Allen's condition was permanent, the Committee reasoned, he had not made the requisite showing to be eligible for T&PD Benefits under the Plan.  (*Id.*)  Based on these findings, the Committee once again denied Allen's request for T&PD Benefits.  This information was conveyed to Allen's counsel via letter by the Committee dated May 9, 2002.  This lawsuit followed.

Allen brought this action against the Kimberly-Clark Corporation Pension Plan pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"). In particular, Allen sought an award of benefits under an ERISA plan, pursuant to § 29 U.S.C. 1132(a)(1)(B), as well as injunctive or other equitable relief, based on his contention that the denial of T&PD Benefits under the Plan was arbitrary and capricious.  (*See* doc. 1.)  Defendant now moves for summary judgment.

## II.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon*

*Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

### III.   Analysis.

A plaintiff suing to recover benefits under an ERISA plan, as Allen does here, "bears the burden of proving his entitlement to contractual benefits." *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998). The parties are in agreement that the Committee's decision to deny T&PD Benefits to Allen must be reviewed under an "arbitrary and capricious" standard. (Defendant's Proposed Findings (doc. 30), at 11; Plaintiff's Brief (doc. 35), at 1.)[9] "In reviewing a termination of benefits under the arbitrary and capricious standard, the function of a reviewing court is to discern whether there was a reasonable basis for the decision, relying on the facts known to the administrator at the time the decision was made." *Buckley v. Metropolitan Life*, 115 F.3d 936, 941 (11th Cir. 1997).

The Eleventh Circuit has outlined a well-defined series of steps that courts must follow in reviewing a denial of benefits decision in an ERISA case.[10] "At each step, the court makes a determination that results in either the progression to the next step or the end of the inquiry."

---

[9]      The parties' position comports with binding authority. *See, e.g., Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1232 (11th Cir. 2006) (if the plan documents grant the administrator discretion to interpret disputed terms, then arbitrary and capricious review applies, except that heightened arbitrary and capricious review may apply if the administrator has a conflict of interest); *HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 993 (11th Cir. 2001) (if the plan documents "grant the claims administrator discretion, then at a minimum, the court applies arbitrary and capricious review"); *Buckley v. Metropolitan Life*, 115 F.3d 936, 939 (11th Cir. 1997) (similar). On their face, the Plan documents confer discretion on the Committee to determine eligibility for and amount of benefits under the Plan, to make factual determinations under the Plan, to construe and resolve any ambiguity in the Plan's terms, and to determine any questions arising in connection with the Plan's operation and administration. (Record, at 221, § 7.7.) There being no question that the Committee is granted discretion to interpret disputed terms under the Plan, some iteration of arbitrary and capricious review clearly applies.

[10]      Although the parties make no mention of it in their briefs, this framework applies to judicial review of "virtually *all* ERISA-plan benefit denials," including "both benefits denials based on plan interpretations as well as on factual determinations." *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1137 & n.6 (11th Cir. 2004); *see also Shaw v. Connecticut General Life Ins. Co.*, 353 F.3d 1276, 1285 (11th Cir. 2003) ("our Court has already declined to draw a distinction between law and fact in choosing the standard of review for denial of ERISA benefits").

*Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1232 (11th Cir. 2006) (citing *HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 993 (11th Cir. 2001)).  Step one is to determine whether the standard of review is *de novo* or some form of arbitrary and capricious review.  This the Court has already done, so we move to step two.  "In step two, regardless of whether arbitrary and capricious review or the heightened form of that standard of review applies, the court reviews *de novo* the claims administrator's interpretation of the plan to determine whether it is 'wrong,'" in the sense that the court disagrees with it after reviewing the plan documents *de novo*.  *Tippitt*, 457 F.3d at 1232; *see also HCA*, 240 F.3d at 993.  "If the court determines that the administrator's interpretation is right, the inquiry ends, but if it determines that the interpretation is wrong, the court proceeds to step three."  *Tippitt*, 457 F.3d at 1232; *see also HCA*, 240 F.3d at 993-94; *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1137 (11th Cir. 2004) (court must first apply *de novo* standard to determine whether benefits-denial decision is "wrong" in the sense that the court disagrees with it; "if it is not, then end the inquiry and affirm the decision").

        After *de novo* review of the record and the arguments presented by the parties, the Court finds that the Committee's denial of benefits to Allen was not wrong.  The terms of the Plan unambiguously provide that, in order to be eligible for T&PD Benefits, Allen was required to present satisfactory proof of his Total and Permanent Disability, a defined term meaning that Allen was totally disabled "to such an extent that he is rendered wholly or continuously unable to engage in any occupation or perform any work for any kind of compensation of financial value.  The disability must be certified by a licensed Doctor of Medicine to be such as can reasonably be expected to continue during the remainder of [Allen]'s lifetime."  (Record, at 193.)

        The evidence offered by Allen to the Committee fell far short of this definitional threshold.  Allen's evidence showed that, while he had been diagnosed with migraine headaches for several years, he had continued working at Kimberly-Clark during that timespan.  Furthermore, while Allen reported that his condition had been exacerbated by his beginning a new job as a forklift driver in September 1999, and that he had taken a medical leave of absence from work for several weeks thereafter, his family practitioner and his neurologist had cleared him to return to work on November 8, 1999, and his family practitioner had submitted a report in December 1999 advising the Committee that Allen had only moderate limitations and that he

should be able to perform a quiet low pressure sedentary job.  Based on this medical evidence, which was before the Committee at the time of both the February 2000 denial and the March 2002 denial of Allen's appeal, all indications were that Allen was able to work.  As such, the Committee could not reasonably have determined on such a record that Allen was "wholly or continuously unable to engage in any occupation or perform any work" and that such a disability "can be reasonably expected to continue during the remainder of [his] lifetime," as required for an award of T&PD Benefits under the Plan.  The Court therefore finds, upon *de novo* scrutiny, that February 2000 and March 2002 benefit denials were not wrong.

On his third round of review before the Committee, Allen submitted only one new piece of evidence, to-wit:  the ALJ decision dated August 16, 2001, awarding him Social Security disability benefits.[11]  Although the ALJ determined that "[n]o work exists which the claimant can perform on a regular or sustained basis at acceptable levels of performance" and that Allen had "been under a disability as defined by the Social Security Act and Regulations since October 9, 1999," (Record, at 13), those findings were not binding on the Committee.  They were made under a different definitional framework, and were based on different evidence, than that utilized by the Committee.[12]  It is not surprising, and in no way inconsistent, that the Committee and the ALJ reached different determinations as to whether Allen is disabled.  After all, they were considering different evidence, and applying such evidence to differing definitions of disability.

---

[11]     Allen submitted the ALJ decision without any of the underlying medical documentation, even though the Committee expressly invited him to submit those supporting materials.  As such, there is some question as to whether the Committee should have credited the ALJ decision at all, given that it contained a synopsis of medical evidence that Allen had never presented to the Committee.  (Record, at 2.)  The Committee, in its discretion, chose to consider the ALJ decision; therefore, this Court will do the same in assessing whether the Committee's denial of T&PD Benefits to Allen was wrong.

[12]     It does not appear, for example, that the ALJ was aware that Dr. Sutton had opined in December 1999 that Allen had only moderate limitations and that Allen should be able to perform a quiet low pressure sedentary job.  Likewise, it does not appear that the ALJ knew that Allen's physicians had released Allen to return to work in November 1999, after the onset date of his alleged disability, or that Allen had continued working at Kimberly-Clark for several years after first being diagnosed with migraine headaches.  Furthermore, the ALJ had the benefit of expanded medical opinions of Dr. Sutton, and the opinions of Dr. Hinton, none of which Allen ever made available to the Committee in connection with his claims for T&PD Benefits.

Thus, any suggestion by Allen that the Committee's decision is wrong simply because it did not reach the same conclusion as the Social Security ALJ did is unavailing.

Getting down to brass tacks, then, does anything in the ALJ decision establish that Allen has a Total and Permanent Disability pursuant to the Plan?  The answer is no.  Certainly, the decision's reference to Dr. Hinton's report that Allen suffers five to six migraines per week with pain levels approaching the worst pain imaginable might reasonably support a conclusion that Allen was wholly or continuously unable to engage in any occupation or perform any work.  But the Committee did not have the benefit of Dr. Hinton's report, and the Court cannot say that it was wrong of the Committee not to credit the ALJ's synopsis of that report, particularly where Allen had been invited to submit the underlying materials prior to the Committee's review of his benefits denial in light of the Social Security decision, but had failed to do so.  Simply put, it was not wrong of the Committee not to credit a summary of clinical medical evidence, where Allen elected not to submit the clinical evidence itself.  Nor was it wrong of the Committee not to credit the ALJ's synopsis of Dr. Sutton's opinion that Allen's pain was so extensive as to be distracting to adequate performance of work activities.  This opinion appears in conflict with Dr. Sutton's representations to the Committee in December 1999 that Allen had only moderate limitations and should be able to work a quiet sedentary job.  Even if the ALJ's report should have prompted the Committee to conclude that Allen is wholly and continuously unable to engage in any occupation or perform any work, Allen would remain unqualified for T&PD Benefits without a medical opinion that this disabling condition was reasonably expected to continue for the remainder of his lifetime.  Such a showing is an absolute prerequisite to eligibility for T&PD Benefits under the Plan.  (Record, at 193.)  But nothing in the ALJ decision states or suggests that Allen's disability is reasonably expected to render him permanently unable to perform any work.[13]

_____

[13]        At most, the record shows that Dr. Sutton opined in December 1999 that Allen's restrictions were permanent.  (Record, at 53.)  But the "restrictions" referenced by Dr. Sutton in December 1999 were not restrictions that would prevent Allen from working altogether; to the contrary, Dr. Sutton opined in the same report that Allen was able to work.  It is one thing to say that Allen was subject to certain permanent, non-disabling work restrictions; it is another to say that he suffered from a permanent disabling condition.  Dr. Sutton's opinion covers only the first, and not the second; therefore, it cannot establish that Allen was totally and permanently disabled.

In short, after careful review of the record before the Committee, and applying the *de novo* standard in the multi-step approach formulated by the Eleventh Circuit for review of ERISA-plan benefit denials, the Court finds that the Committee's decision was not "wrong" (*i.e.*, the Court does not disagree with that decision).[14]  That determination is conclusive of this matter and requires the Court to affirm the plan administrator's decision without further traversing the multi-step review process.  *See, e.g., Tippitt*, 457 F.3d at 1232 ("If the court determines that the administrator's interpretation is right, the inquiry ends, but if it determines that the interpretation is wrong, the court proceeds to step three."); *Williams*, 373 F.3d at 1139 ("Because no grounds exist to disturb Kemper's determination under the *de novo* review standard, we need not review it under the more deferential ('mere' or 'heightened' arbitrary and capricious) standard, much less reach the parties' remaining arguments.").

Even if the Committee's denial of benefits could somehow be deemed "wrong" on the administrative record presented, Allen's ERISA claims would still fail.  Had the analysis proceeded to step three, the Court would determine whether Allen had "proposed a reasonable interpretation of the plan."  *Tippitt*, 457 F.3d at 1232 (citation omitted).  Assuming that Allen could show that his evidence of total and permanent disability might reasonably be viewed as satisfying the strict Plan eligibility criteria, the analysis would proceed to step four, to "determine whether the claims administrator's wrong interpretation is nonetheless reasonable."  *Id.* (citation omitted).  The foregoing discussion plainly establishes that the Committee's decision to deny T&PD Benefits to Allen on the evidence presented was reasonable, such that it is entitled to deference "even though the claimant's interpretation is also reasonable, and the

---

[14]     In so concluding, the Court notes that plaintiff's Brief (doc. 35) is unhelpful in identifying aspects of the Committee's decision that plaintiff believes were incorrect.  Plaintiff generally accuses the movant of "pick[ing] and choos[ing] portions of the record favoring its initial decision," without identifying other evidence in the record that he maintains is to the contrary.  (Plaintiff's Brief, at 2.)  Plaintiff argues in conclusory generalizations that the Committee "failed to take into account the evidence showing that the Plaintiff was permanently and totally disabled," without ever indicating what that evidence is.  (*Id.*)  "Courts cannot read minds."  *Reflectone, Inc. v. Farrand Optical Co.*, 862 F.2d 841, 844 (11th Cir. 1989).  That limitation renders it difficult to discern exactly what plaintiff's argument is or what evidence he would rely on in maintaining that the Committee's decision was wrong; nonetheless, the Court has reviewed the administrative record in its entirety.

-12-

court moves to step five." *Id.*  Step five involves a determination of the administrator's self-interest, for purposes of assessing whether ordinary or heightened arbitrary and capricious review applies.  Here, plaintiff has not argued that a conflict of interest exists, and the evidence reveals no conflict between Kimberly-Clark's profit-making interest and the fiduciary interest of the Committee, which is vested with sole and exclusive discretion to interpret and implement the Plan and which does not pay benefits out of its own funds.  (*See* Record, at 221 and 223, §§ 7.7 & 8.1.)  Thus, any suggestion of a conflict of interest (which Allen has not made, in any event) in the Committee's decision of whether to award or deny T&PD Benefits to Allen would be unfounded.  There being no conflict of interest, and the Committee's decision having been supported by reasonable grounds, the denial of benefits is due to be affirmed under the ordinary arbitrary and capricious standard of review.  *See, e.g., Tippitt*, 457 F.3d at 1232 ("If no conflict of interest exists, then only arbitrary and capricious review applies and the claims administrator's wrong but reasonable decision will not be found arbitrary and capricious.") (citation omitted); *Williams*, 373 F.3d at 1138 ("if reasonable grounds do exist, then determine if he operated under a conflict of interest" and "[i]f there is no conflict, then end the inquiry and affirm the decision").

**IV.    Conclusion.**

        For all of the foregoing reasons, the Court determines that the decision by Kimberly-Clark's Pension Plan Committee to deny total and permanent disability benefits to plaintiff on each of the three times it reviewed his application was not wrong because the clinical evidence proffered by plaintiff did not establish that (1) he was totally unable to work because of a disability, and (2) that such inability to work was expected to be permanent.  Indeed, plaintiff's evidence submitted to the Committee was that he had worked for several years with his condition, that his physicians had cleared him to return to work, and that his family practitioner had opined that he had only moderate limitations and was able to work in a low stress sedentary job.  Even if the Committee's decision to deny plaintiff benefits under the Plan had been wrong, it was unquestionably reasonable.  Because the parties agree that arbitrary and capricious review applies, and because the Committee's decision was eminently reasonable, that decision (even if wrong) cannot be disturbed by this Court.  Accordingly, plaintiff's claims for benefits and for injunctive and equitable relief under ERISA fail as a matter of law.  Defendant's Motion for

Summary Judgment (doc. 30) is **granted**, and the Complaint is **dismissed with prejudice**.  A separate judgment will enter.

DONE and ORDERED this 14th day of May, 2007.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE